# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID B. HAUG, | ) 1:06cv0834 DLB |
| | ) |
| | ) |
| | ) ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **BACKGROUND**

Plaintiff David B. Haug ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On October 25, 2006, the Honorable Anthony W. Ishii reassigned the case to the undersigned for all purposes.

1

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed an application for disability insurance benefits on March 25, 2002, alleging disability since June 30, 1999, due to spondyloarthropathy, plantar fasciitis, inflammation in his hands, knuckles and sacroilliac joints, eye strain and sensitivity to light. AR 68-71, 75-84. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 53-56, 60, 64. On February 19, 2004, ALJ James Ross held a hearing. AR 227-254. ALJ Ross denied Plaintiff's claim on May 26, 2004. AR 11-19. On August 10, 2004, the Appeals Council denied review. AR 5-8. However, after an order of remand from this Court, the Appeals Council vacated the May 26, 2004, decision and remanded the action to the ALJ for further proceedings.

Consistent with the remand order, ALJ Ross held a second hearing on January 1, 2006. AR 327-350. He issued a decision denying benefits on March 13, 2006. AR 262-273. The Appeals Council denied review on May 8, 2006. AR 255-257.

Hearing Testimony

*First Hearing*

ALJ Ross held the first hearing on February 19, 2004, in Fresno, California. Plaintiff appeared with his attorney, Robert Christenson. AR 227.

Plaintiff testified that he was 33 years old and held an Associate's Degree. AR 230. He last worked as a service technician with Pacific Bell in 2000. AR 231. He could no longer do the job because he couldn't sit down and drive the truck. AR 250.

Plaintiff has pain in the arches of his feet and his heels and the pain is worse when he is stationary, i.e., standing. He also has pain in his sacroilliac joints so that every time he sits down, he has severe pain. Reclining alleviates the pain. AR 234. He also has pain in his right knee and has problems kneeling. AR 234. He has to sit a certain way, but he can only do so for so long before everything starts hurting and he has to lie down for 15 minutes, sometimes every hour.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

AR 235-236.  He also has to take a nap in the afternoon for an hour.  AR 236.  He uses orthotics in his shoes but still has pain.  AR 239.

Plaintiff's treating rheumatologist recommended Plaintiff for a scholarship to use a rehabilitation facility where he swims three times a week, for about 15 minutes.  AR 238.  Ibuprofen is the only medicine he takes.  AR 242.

Plaintiff believed that he could stand for 10 minutes before needing to move around, and sit for about 10 minutes in a "regular" chair.  He can walk for 15 to 20 minutes, but has to start and stop during that time.  AR 241.  He thought he could sit and stand for a total of 30 minutes each in an eight hour day.  AR 241-242.  He can lift 10 pounds, but not repetitively because his knuckles would flare up.  AR 241.

During the day, Plaintiff is able to cook simple meals.  He lives alone in a house and is able to mow the lawn using a self-propelling mower.  AR 243.  He is able to shower, with pain, and does the dishes.  He reads during the day and naps.  AR 245.  He swims three times a week and watches television in the evening.  He does not have a social life because he can't sit down.  AR 246.

*Second Hearing*

ALJ Ross held a second hearing on January 1, 2006, in Fresno, California.  Plaintiff appeared with his attorney, Mr. Christenson.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 327.

Plaintiff testified that there has been no change in his condition since the last hearing in May 2004.  AR 334.  He still swims and uses other fitness equipment two to three times a week to keep himself from deteriorating.  AR 334-335.  Plaintiff was working as a handyman for odd jobs for the past four months.  AR 338.

Plaintiff explained that the middle of his back down to below his buttocks hurts when any type of pressure is applied to the area.  He sits and kneels in different positions to help with the pain, and also wears loose clothing and uses orthotics in his shoes.  He testified that he has to change positions, including kneeling on all fours, all day and that his pain gets worse in the

1  afternoon. AR 340. Although walking alleviates his pain, walking starts to bother him by the
2  afternoon. AR 342.
3     For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age,
4  education and work experience. This person could lift 20 pounds occasionally, ten pounds
5  frequently. He could sit, stand and/or walk for eight hours, but needed a sit/stand option. He
6  could only occasionally climb, balance, stoop, kneel, crouch or crawl, and had to avoid walking
7  on uneven, rough terrain. The VE responded that this person could not perform any of Plaintiff's
8  past relevant work. This person could perform sedentary and light unskilled positions, reduced
9  by two-thirds for the sit/stand option. Positions include loader of semi-conductor dies, garment
10  sorter, and document preparer. AR 344-347.
11     Plaintiff's attorney asked the VE to assume a person who required rest intervals of five to
12  ten minutes, at least every hour. This person could not perform any work. AR 347-348.
13     If the person in the ALJ's hypothetical needed to kneel down, or get on all fours or lie on
14  his stomach, every hour for about 15 minutes, this person would not be able to perform any work.
15  AR 348-349.
16     Plaintiff's attorney then asked the VE to look at how Plaintiff was sitting and opine as to
17  whether he could perform work. The VE responded that he equated the way he was sitting with
18  the sit/stand option. AR 349.
19     <u>Medical Record</u>
20     Plaintiff underwent an MRI of his right knee on May 3, 1999. There was an
21  osteochondroma projecting off the medial femoral condyle, but the MRI did not reveal any
22  significant abnormality. AR 152. X-rays of his right knee were also normal. AR 153.
23     On May 26, 1999, Plaintiff underwent an MRI of his lumbosacral spine because of a
24  history of hip and lower extremity pain. The MRI was unremarkable. AR 151.
25     On August 9, 1999, Plaintiff was seen by Steve Paragioudakis, M.D., at UCSF Stanford
26  Health Care Spine Clinic for complaints of non-radiating coccyx pain. Plaintiff reported that he
27  could not sit for more than several minutes at a time, but had no leg or groin pain or trouble
28  sleeping. Upon examination, Plaintiff was in no apparent distress but was uncomfortable sitting.

4

He felt better standing and walking.  Range of motion in all joints was normal and sensation was grossly intact in his upper extremities.  There was tenderness to palpation in the coccyx area just below the upper sacral segments and mild tenderness to palpation around the sacroiliac ("SI") joints.  Range of motion in his knees was normal and not painful, but there was an osteochondroma around the right knee area.  Neurologic examination was also normal.  Dr. Paragioudakis reviewed a prior bone scan that showed increased uptake around the SI joints and an MRI scan of the pelvis that showed an abnormal signal around his superior SI joints.  AR 130-131.  Given Plaintiff's complaints, Dr. Paragioudakis diagnosed a possible rheumatologic syndrome such as Reiter's or early ankylosing spondylitis.  He ordered testing and referred Plaintiff to a rheumatologist.  AR 131-132.

On September 9, 1999, Plaintiff was seen by rheumatologist Saigeetha Sundaramurthy, M.D., at UCSF Stanford Health Care in evaluation of coccyx pain with radiation to his hip, heel pain and right knee pain.  Physical examination was normal except for some tenderness over the SI joints.  Dr. Sundaramurthy diagnosed spondyloarthropathy, i.e., Reiter's syndrome, etiology unclear.  Tests were scheduled and he was started on Celebrex.  AR 141-143.

X-rays of Plaintiff's feet taken on September 14, 1999, showed no evidence of a foot arthropathy, but there was a sizable osteochondroma on the left fifth metatarsal, which was enlarged and distorted in appearance.  AR 149.

On September 16, 1999, Plaintiff returned to Dr. Paragioudakis.  Prior blood work was within normal limits.  Plaintiff complained that his pain was making it very difficult for him to sit for extended periods of time.  Neurologically, Plaintiff continued to be intact bilaterally in both lower extremities and was nontender to palpation around the coccyx.  His physical examination was within normal limits and range of motion in his cervical and lumbar spine, shoulders elbows and wrists was normal.  He had full range of motion in his ankles and hips.  Patrick tests for the SI joints were negative.  Dr. Paragiousdakis wanted to see how he responded to Celebrex and indicated that he'd be following up with the rheumatologist for evaluation of the CT scans.  AR 124.

A September 29, 1999, CT scan of Plaintiff's pelvis was normal, and there was no evidence of spondyloarthropathy. AR 148.

On October 14, 1999, Dr. Sundaramurthy diagnosed spondyloarthropathy and opined that Plaintiff was disabled through November 30, 1999. AR 185.

On November 11, 1999, Plaintiff reported to Dr. Sundaramurthy that Celebrex and Vioxx were not working. AR 122.

On November 12, 1999, Dr. Sundaramurthy completed a Medical Certificate in which he indicated that Plaintiff was disabled through January 11, 2000. AR 184. He listed Plaintiff's limitations as back and heel pain, an inability to sit for prolonged periods and difficulty walking. AR 184.

On January 4, 2000, Dr. Firtch, a treating source at Kaiser Permanente, diagnosed Plaintiff with sacroiliac dysfunction and opined that he could sit for one-half hour at a time, occasionally lift 25 pounds, and never bend, squat, kneel, or climb. He further opined that Plaintiff was disabled from his usual and customary work for three months. AR 192.

On March 15, 2000, Plaintiff underwent an SI joint block performed by Garrett D. Kline, M.D. Dr. Kline indicated that he was not entirely sure of the source of Plaintiff's ongoing pain, but that he had an approximately 50 percent overall improvement after the injections. AR 140.

On March 21, 2000, Dr. Firtch opined that Plaintiff could occasionally lift up to 25 pounds, but could not bend, squat, kneel or climb. He further opined that Plaintiff was disabled through June 21, 2000. AR 191.

On May 10, 2000, Dr. Firtch opined that Plaintiff was disabled through August 10, 2000. AR 190.

On June 14, 2000, Dr. Firtch opined that Plaintiff's spinal pain was not expected to change over the next six months. AR 189.

Plaintiff underwent a consultive examination by Tomas B. Rios, M.D., on May 16, 2002. Plaintiff reported that he had a history of plantar fasciitis and spondyloarthropathy. Plaintiff was not in severe distress but walked with a slight limp on the right side. There was noticeable palpatory tenderness along the SI joints, more pronounced on the right than the left. There was

marked crepitation in both knees along with tenderness in the wrist region.  There was some tenderness to palpation along the calcaneal area of the rood, but no gross deformities.  He was able to stand on his toes and heels but had difficulty walking on his heels.  Straight leg raising was negative, as was Farber test and Bragard's maneuver.  Motor strength was 5/5 in both his upper and lower extremities.  Muscle bulk and tone were preserved and grip strength was strong and adequate bilaterally.  Sensory examination was intact.  AR 156-159.

Dr. Rios diagnosed a history of plantar fasciitis, sacroiliitis, a history of subjective photophobia, arthralgia and temporomandibular joint syndrome.  He indicated that Plaintiff had a plantar spur with possible heel spur, and opined that he would have difficulty walking on uneven ground.  His ability to carry and walk was limited to no more than six hours in an eight hour period of work time, but he would require rest intervals at least every hour.  Plaintiff had clinical manifestations of spondyloarthropathy and underlying arthritis.  He would have difficulty with frequent bending, stooping, squatting, crouching, crawling and climbing.  AR 159-160.

On June 6, 2002, State Agency physician Murray Mitts, M.D., completed a Physical Residual Functional Capacity Assessment form.  He opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about six hours in an eight hour day, and could sit about six hours in an eight hour day.  He could occasionally climb, balance, stoop, kneel, crouch and crawl and could not work on uneven terrain.  AR 161-167.

On July 18, 2002, State Agency physician Ernest Wong, M.D., found similar restrictions in a Physical Residual Functional Capacity Assessment form.  He opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about six hours in an eight hour day, and could sit about six hours in an eight hour day.  However, he needed to alternate between sitting and standing every hour.   He could occasionally climb, balance, stoop, kneel, crouch and crawl and could not work on uneven terrain.  AR 174-180.

Plaintiff saw Charles H. Boniske, M.D., on November 18, 2002, for a rheumatological evaluation.  Plaintiff reported that he could not stand on his feet for more than 20-30 minutes without a lot of discomfort.  At that time, Plaintiff had not worked full time in several years and could not work because of his chronic pain.  Plaintiff took about six ibuprofen a day as it was the

only medication that helped. On examination, there were almost no significant trigger points in the axial skeleton. There was no tenderness to palpation over the SI joints, but he was mildly tender over the medial aspect of the ischium bilaterally. He had excellent grip strength, no inflammation and no localized tenderness. His hips moved well but he was slightly tender over the trochanters. His knees moved well without inflammation, swelling or laxity and there was no patellofemoral crepitus. There was no tenderness along the plantar fascia and his peripheral pulses were good.

Dr. Boniske explained that he did "not have a good label" for Plaintiff. His SI joints looked normal so a seronegative spondyloarthropathy was "quite unlikely." Since he did not have a specific label, he had difficulty in giving a strong recommendation "for anything." An exercise regime would be useful, including swimming, walking and back exercises. Dr. Boniske opined that if he could strengthen himself, he could maybe go back to college "and get a degree where he can do some sort of gratifying work." Dr. Boniske also thought Plaintiff was clinically depressed although he was not interested in taking an antidepressant. AR 207-208.

Dr. Boniske wrote a letter to the Lifestyles Center on November 25, 2002, in which he recommended Plaintiff for a scholarship and indicated that Plaintiff was cleared to workout at Lifestyles and was totally disabled and unable to work. AR 203.

Plaintiff saw Dr. Boniske again on January 24, 2003. Dr. Boniske reviewed recent x-rays and did not see any significant inflammation or osteoarthritic changes in any of the small joints of the hands, wrists, ankles, feet or hips. His sacroiliac joints looked "fine." On examination, there was no gross inflammation in his hands, wrists, elbows or shoulders and he was walking well. Dr. Boniske was still unclear of the etiology of Plaintiff's severe, generalized pain. Dr. Boniske was going to review some studies and gave Plaintiff a trial of Azulfidine. AR 201.

On April 21, 2003, Plaintiff saw Dr. Boniske with chronic generalized muscle complaints. Plaintiff reported no benefit from the Azulfidine and thought that the only thing that helped was ibuprofen. Swimming was helping him gain strength in his upper extremities but he continued to have a lot of pain in all joints. There was no gross synoivitis in any of his

periphereal joints and he had excellent motion.  He instructed Plaintiff to stop the Azulfidine, continue ibuprofen and return in six months.  AR 196.

Plaintiff returned to Dr. Boniske on October 7, 2003.  On examination, he had good motion in his hips and no inflammation in his knees.  There was a little crepitus in his right knee and no inflammation in the ankles.  Dr. Boniske reviewed a prior bone scan and recent x-rays and opined that there is no progressive sacroilliac disease.  Dr. Boniske told Plaintiff that he still does not have a good handle on the cause of his pain but that he was clinically stable.  Plaintiff indicated that he had no insurance and did not wish to have any further workup.  AR 195.  Dr. Boniske continued Plaintiff's ibuprofen and told Plaintiff to return in six months.  AR 195.

On April 24, 2004, Thomas D. Beardmore, M.D., responded to the ALJ's request for an expert medical opinion.  AR 210.  He indicated that Plaintiff had extensive evaluations without a clear diagnosis and all of his tests have been within normal limits.  Dr. Beardmore opined that the medical evidence did not support Plaintiff's allegations of being unable to work or sit/stand for prolonged periods.  The medical evidence did support some of this allegations, though.  He consistently complained of pain and was prescribed medications (ibuprofen).  AR 216-219.

On May 17, 2004, Plaintiff saw James B. Billys, M.D. for evaluation of his chronic hip and buttock pain.  On examination, his sensation was intact and there was full range of motion in his hip, knee and ankle without pain.  Straight leg raising, popliteal compression test, and sciatic notch tenderness were negative.  There was tenderness over the SI area bilaterally that extended laterally to the coccygeal region.  Dr. Billys suggested that they work through all possible etiologies for his pain, starting with an MRI of his lower back.  AR 306-307.

Plaintiff underwent an MRI of his lumbar spine and SI joints on June 10, 2004.   There was minimal posterior disc bulging at L4-5, but no herniation, spinal stenosis or encroachment upon the neural foramina.  There was also mild degenerative changes of the facet joints at the L4-5 level.  The MRI was otherwise normal.  AR 225-226.

On June 16, 2004, Plaintiff returned to Dr. Billys.  He had tenderness over the lumbosacral junction and mild pain with bending forward.  Dr. Billys reviewed the MRI and

explained that it demonstrated normal perisacroiliac joints with a degenerative L5-S1 disk. Plaintiff chose to proceed with discography rather than epidural/facet injections. AR 303.

Plaintiff underwent discography in August 2004. AR 310-311. He had a normal disc at L4-5 and a posterior fissure at L5-L6, but it was not painful. AR 308.

A CT scan of Plaintiff's lumbar spine performed on August 26, 2004, revealed mild degeneration at L4-L5 and moderate degeneration at L5-S1. AR 325-326.

In a September 2004, report by William Von Kaenel, M.D., Plaintiff rated his pain at a four out of ten and indicated that 100 percent of his pain was in his back. AR 308. Dr. Kaenel opined that a prior trauma may have contributed to arthropathy in his SI joints. AR 309.

In January 2005, Plaintiff continued to complain of pelvic pain while sitting and pain in his heels. He requested to be cleared for independent exercise. Plaintiff was given ibuprofen and encouraged to continue exercising. AR 319.

ALJ's Findings

After reviewing the medical evidence, ALJ Ross determined that Plaintiff had the severe impairments of diffuse body pain of unclear etiology and plantar fasciitis. AR 268. He further found that Plaintiff's allegations were not wholly credible. Plaintiff retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, and to sit, stand and/or walk for six hours in an eight hour workday. He had to alternate between sitting and standing every hour, could occasionally climb, balance, stoop, kneel, crouch and crawl. He had to avoid uneven terrain. AR 271. Using the Medical Vocational Guidelines along with the testimony of the VE, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. AR 272.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v.*

1  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a
2  reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at
3  401. The record as a whole must be considered, weighing both the evidence that supports and
4  the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993,
5  995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must
6  apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).
7  This Court must uphold the Commissioner's determination that the claimant is not disabled if the
8  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by
9  substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th
10 Cir. 1987).

**REVIEW**

12 In order to qualify for benefits, a claimant must establish that he is unable to engage in
13 substantial gainful activity due to a medically determinable physical or mental impairment which
14 has lasted or can be expected to last for a continuous period of not less than 12 months. 42
15 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of
16 such severity that he is not only unable to do her previous work, but cannot, considering his age,
17 education, and work experience, engage in any other kind of substantial gainful work which
18 exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).
19 The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th
20 Cir. 1990).

21 In an effort to achieve uniformity of decisions, the Commissioner has promulgated
22 regulations which contain, inter alia, a five-step sequential disability evaluation process. 20
23 C.F.R. §§ 404.1520 (a)-(e), 416.920 (a)-(g) (2005). Applying this process in this case, the ALJ
24 found that Plaintiff: (1) had not engaged in substantial gainful activity since his alleged onset of
25 disability; (2) has an impairment or a combination of impairments that is considered "severe"
26 (diffuse body pain of unclear etiology and plantar fasciitis) based on the requirements in the
27 Regulations (20 CFR §§ 416.920(c)); (3) does not have an impairment or combination of
28 impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P of

Part 404; (4) cannot perform his past relevant work; but (5) retains the RFC to perform a significant number of jobs in the national economy. AR 270-272.

Plaintiff argues that the ALJ erred by (1) improperly rejecting a specific portion of Dr. Rios' opinion; (2) failing to adopt the VE testimony that considered the limitations imposed by Dr. Rios; (3) giving little weight to the opinion of treating rheumatologist Dr. Boniske; and (4) improperly assessing Plaintiff's credibility.

## DISCUSSION

A.   Dr. Rios' Opinion

Plaintiff argues that the ALJ failed to explain why he found Dr. Rios' opinion consistent with the medical evidence and worthy of great weight, yet did not include Dr. Rios' belief that Plaintiff would require rest intervals at least every hour in the RFC. Plaintiff contends that this limitation is different than needing to alternate between sitting and standing every hour.

Here, the ALJ set forth the medical evidence, including Dr. Rios' consultive examination and findings. He set forth Dr. Rios' assessed limitations and the weight attached to them as follows:

> Dr. Rios opined that the claimant would have difficulty walking on uneven ground, could occasionally bend, stoop, squat, crouch, crawl and climb, and could carry and walk for six hours in an eight hour day, but would require rest intervals at least every hour. Reasonably considering the claimant's subjective complaints in light of the minimal objective physical findings, the opinions of the State Agency physicians and consultive examiner Dr. Rios are consistent with the objective medical evidence and are given great weight.

AR 270. The ALJ then set forth his RFC finding:

> After careful consideration of the entire record, I find that the claimant had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently and sit, stand and/or walk for 6 hours in an 8-hour workday. He must alternate sitting and standing every hour, climb, balance, stoop kneel, crouch and crawl occasionally, and should avoid uneven terrain.

AR 271.

The ALJ was entitled to rely on Dr. Rios' findings in support of his RFC determination. *Tonapetyan v. Haler*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultive examiner's opinion may constitute substantial evidence because it is based on examiner's independent findings and observations). Plaintiff does not argue that he improperly did so, but rather faults the ALJ for not

specifically explaining why he rejected Dr. Rios' finding that Plaintiff needed to take rest breaks at least every hour.

The Ninth Circuit has repeatedly held that the ALJ need not specifically explain why he rejected every portion of an opinion so long as the overall finding is supported by substantial evidence:

> It is true that the ALJ did not recite the magic words, "I reject Dr. Fox's opinion about the onset date because...." But our cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion. It is proper for us to read the paragraph discussing Dr. Pont's findings and opinion, and draw inferences relevant to Dr. Fox's findings and opinion, if those inferences are there to be drawn.

Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989).

Defendant contends that Plaintiff takes the statement about rest intervals out of context, and suggests that it was related to Plaintiff's ability to walk, rather than a *generalized* need to rest on an hourly basis. Indeed, the statement is made in the numerical paragraph discussing Plaintiff's foot pain and in the sentence indicating that Plaintiff can walk and carry for no more than a six hour period. As Defendant also points out, there are no notations of subjective complaints of generalized fatigue in Dr. Rios' report. Other than Plaintiff's testimony, in fact, there are no notations in the record relating to fatigue. Therefore, under this reasonable construction, the need to take rest intervals every hour is encompassed within the requirement that Plaintiff alternate between sitting and standing every hour.

Although Plaintiff argues that the need to rest every hour is *not* the same as the sit/stand option, there is nothing to support this inference. As the Court just explained, there is no evidence in the record, other than Plaintiff's own testimony, to support a generalized need to rest every hour. The ALJ's adoption of Dr. Rios' limitations was supported by substantial evidence and was free of legal error.

B.      Hypothetical Question

In a related argument, Plaintiff contends that ALJ failed to adopt the hypothetical question posed by Plaintiff's attorney that included "rest intervals at least every hour" for five to

13

1  ten minutes.  AR 347.  Plaintiff argues that this hypothetical question, and the resulting testimony
2  that Plaintiff could not perform any work, should have been adopted based on Dr. Rios' opinion.
3      "Hypothetical questions posed to the vocational expert must set out all the limitations and
4  restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).
5  The testimony of a VE "is valuable only to the extent that it is supported by medical evidence."
6  *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982).
7      The Court's finding that the ALJ did not err by failing to include Dr, Rio's rest limitation
8  as Plaintiff interprets it, i.e., a generalized need to stop activity and rest, disposes of this
9  argument.  Such a limitation was not supported by the record, which in turn makes any
10 hypothetical including the limitation unsupported.  The VE's opinion about a claimant's residual
11 functional capacity has no evidentiary value if the assumptions in the hypothetical are not
12 supported by the record.  *Embrey*, 849 F.2d at 422.
13 C.    Treating Physician's Opinion
14     Next, Plaintiff argues that the ALJ erred by giving little weight to Dr. Boniske's opinion,
15 set out in the November 25, 2002, letter to Lifestyles, that Plaintiff was "totally disabled and
16 unable to work."  AR 203.  He believes that this opinion is supported by the medical record.
17     The opinions of treating doctors should be given more weight than the opinions of
18 doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998);
19 *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not
20 contradicted by another doctor, it may be rejected only for "clear and convincing" reasons
21 supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating
22 doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without
23 providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*
24 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out
25 a detailed and thorough summary of the facts and conflicting clinical evidence, stating his
26 interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th
27 Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own
28

interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

Here, the ALJ set forth Dr. Boniske's treatment records, as well as the November 25, 2002 letter to Lifestyles. ALJ Ross stated that he gave careful consideration to this opinion, but explained that he rejected the statement because it was an opinion relating to Plaintiff's ability to perform past work or any work, an issue that is reserved to the Commissioner. AR 270. A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary will concur, absent review of medical findings and other evidence. 20 C.F.R. 416.927(e). "Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ." *Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985).

As the ALJ correctly noted, Dr. Boniske's statement consisted of nothing more than an opinion that Plaintiff was disabled. It did not set out specific limitations, did not contain medical findings to support those limitations, and was not even written in the context of determining Plaintiff's abilities or assessing his medical condition. Rather, the statement was made in a short letter to Lifestyles in an attempt to obtain a scholarship for Plaintiff so that he could work out at the facility. Interestingly, the letter was written after Plaintiff's first appointment with Dr. Boniske after which Dr. Boniske opined that if Plaintiff could strengthen himself, he could maybe go back to college "and get a degree where he can do some sort of gratifying work." AR 208.

Moreover, the November 25, 2002, letter was written in response to Plaintiff's instructions after his review of the prior version of the letter, dated November 18, 2002.[3] AR 204. Plaintiff directed, in writing on a copy of the November 18, 2002, letter, that the words "chronic pain" be included and that the letter say that Plaintiff was cleared to workout at Lifestyles. AR 204. This further calls into question the weight that can be given to Dr. Boniske's statement.

---

[3] The November 18, 2002, letter stated that Plaintiff's joint condition prevented him from working.

15

1    The Court is mindful of the recent decision in *Orn v. Astrue*, ___F.3d ___ (9th Cir. 2007)(2007 WL 2034287), where the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion an examining physician over that of a treating physician. However, where the treating physician's opinion is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

D.    Plaintiff's Subjective Complaints

Finally, Plaintiff argues that the ALJ did not give any reasons for rejecting his testimony regarding his need to take breaks at least every hour.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

In reviewing Plaintiff's testimony at each hearing, the ALJ set forth Plaintiff's allegations regarding his impairment, including his allegation that he had to lie down for most of the day.[4]

---

[4] At the first hearing, Plaintiff testified that he had to "lie down . . . just sometimes every hour." AR 235.

16

1  AR 271. The ALJ concluded that although Plaintiff's medically determinable impairments could
2  reasonably be expected to produce the alleged symptoms, his statements about the intensity,
3  duration and limiting effects of the symptoms were not entirely credible. AR 271.
4        In setting forth this testimony, the ALJ also set forth Plaintiff's testimony that called his
5  allegations into question. For example, Plaintiff testified that he lived by himself, cooked easy
6  meals, did yard work, read, walked for 15 to 20 minutes at a time and swam three times per
7  week. AR 271. *See eg. Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (claimant's
8  allegations of disability properly discredited where claimant was able to care for her own
9  personal needs, cook, clean, shop, interact with her boyfriend and manage finances). Although
10 there are some instances where a claimant's daily activities are not sufficient to find that the
11 claimant spent "a substantial part of his day engaged in pursuits involving the performance of
12 physical functions that are transferrable to a work setting," this does not appear to be one of those
13 cases. *See eg. Orn v. Astrue*, ___ F.3d ___ (9th Cir. 2007)(2007 WL 2034287, *13) (finding
14 that reading, watching television and coloring in coloring books were activities that were "so
15 undemanding that they cannot be said to bear a meaningful relationship to the activities of the
16 workplace."). In addition to being able to take care of himself and swim and exercise on a
17 regular basis, Plaintiff was able to work periodically as a handyman for the four months prior to
18 the second hearing. AR 338. Although the ALJ did not consider this work to be substantial
19 gainful activity, the ALJ is entitled to consider the work in evaluating Plaintiff's daily activities.
20       In another portion of the decision, the ALJ correctly explained that Plaintiff's treatment
21 was not consistent with his allegations. For example, Plaintiff did not receive biofeedback,
22 acupuncture, use a TENS unit, or attend a pain management clinic. AR 269. Plaintiff was also
23 treated mainly with ibuprofen as he found it to be the only medication that helped. AR 269.
24 *Burch,* 400 F.3d at 681 (ALJ is permitted to consider lack of medical treatment in assessing
25 credibility).
26       Contrary to Plaintiff's assertions, the ALJ set forth findings specific enough to allow the
27 Court to determine that he did not arbitrarily discredit Plaintiff's testimony. The credibility
28 determination is supported by substantial evidence and is free of legal error.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, David Haug.

IT IS SO ORDERED.

Dated:   **August 10, 2007**              **/s/ Dennis L. Beck**
                                           UNITED STATES MAGISTRATE JUDGE